Roger W. **KREIMEYER,**
et al., Plaintiffs,

v.

**ALLIANT TECHSYSTEMS,
INC., Defendant.**

No. Civ. 92–NC–088S.

United States District Court,
D.Utah,
Northern Division.

Nov. 22, 1995.

Fred R. Silvester, Silvester & Conroy, Salt Lake City, Utah, Claudia F. Berry, Jesse C. Trentadue, Charles P. Sampson, Suitter Axland & Hanson, Salt Lake City, Utah, Evan A. Schmutz, William Kelly Nash, Hill Harrison Johnson & Schmutz, Provo, Utah, W. Robert Wright, Holme Roberts & Owen, Salt Lake City, Utah, Richard E. Malmgren, Micron Technology Inc., Boise, Idaho, J. Michael Hansen, Salt Lake City, Utah, Mark R. Gaylord, Ballard Spahr Andrews & Ingersoll, Salt Lake City, Utah, Lawrence R. Dingivan, Salt Lake City, Utah, for plaintiff.

Keith E. Taylor, David A. Anderson, Michael A. Zody, W. Mark Gavre, Lois A. Barr, Parsons Behle & Latimer, Salt Lake City, Utah, Brent H. Shimada, Hercules

Inc. Bacchus Works, Magna, Utah, John M. Crane, Jr., Brent E. Zepke, Hercules, Inc., Wilmington, Delaware, for defendant.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON AGE DISCRIMINATION CLAIMS OF ALL REMAINING PLAINTIFFS

SAM, Chief Judge.

This matter came before the court on the defendant's motion for summary judgment on the plaintiffs' claims of age discrimination. For reasons discussed below, the motion is granted.

### I. Background

Each of the original sixty-five plaintiffs in this case was terminated from employment with Hercules, Inc., during a reduction in force (RIF). They sued Hercules and Jon Peterson, Director of Human Resources & Administration for Hercules Bacchus Works,[1] alleging breach of contract and violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634.

The court granted the defendant's motion for summary judgment against all plaintiffs on their breach of contract claims. (Order of September 27, 1994.) As to the age discrimination claims, the court granted the defendant's motions for summary judgment against Erma G. Thompson and Gerald J. Haslip but denied the defendant's motion for summary judgment against George K. March.[2] (Orders of July 28, 1994.)

On July 28, 1994, the claims of the following fifteen plaintiffs were dismissed pursuant to stipulation: Derral J. Allen, Clarence D. Bertino, Northrup E. Garfield Jr., Carl L. Goldfuss, John B. Hansen, Michael Hardman, Robyn M. Johanson, Charles D. Johnson, Carol J. LaFollette,

James A. Larsen, Vern L. Matthews, Jimmie M. Myrick, Larry J. Otteson, Barbara K. Thiel–Perry, and Larry G. Thompson. On August 12, 1994, the claims of R. Bruce Perry, Dennie R. Jackson, and R. Gerald Stewart were likewise dismissed.

Certain plaintiffs asked their counsel to withdraw but failed to enter appearances—either pro se or by counsel—within 30 days of the court's Order of August 29, 1994. Accordingly, the court dismissed the claims of the following twenty-three plaintiffs: Walter Wm. Baker, Larry R. Beck, Raymond R. Bird, David L. Boyd, Kenneth N. Brown, Jesse Marvin Burrows, Joseph V. Cabibi, Terry L. Carter, Elden Clyde, Vonda C. Godwin, Wilford H. Green, Arthur H. Harding, Barbara E. Johnson, Royle E. Johnson, Roger W. Kreimeyer, Arden R. Louder, George K. March, Carl Max Mihlfeith, Jerry J. Neumeier, Thomas Craig Preece, Robert E. Pritt, Joan C. Seeds, and Erma G. Thompson.[3] (Order of October 12, 1994.)

Hercules then filed a motion for summary judgment on the age discrimination claims of the remaining twenty-three plaintiffs. Subsequently, the parties stipulated to dismiss the claims of plaintiffs Benny D. Hullinger and Ernest M. Martinez, and the defendant Alliant Techsystems, Inc., was substituted as the real party in interest. (Nevertheless, this Order will refer hereafter to the defendant Hercules, as the parties did in their memoranda.)

The remaining twenty-one plaintiffs in this case are: James W. Andrew, Wallace D. Bath, Ronald K. Carter, Howard H. Christy, Douglas R. Cummings, Florence E. Gallegos, R. Thomas Giuli, Evelyn S. Green, E. Thomas Hall, Jr., Teri B. Hill, Irvin M. Hillman, Paul J. Hoover, Harold L. McNee, Robert K. Nielsen, M. William

---

1. The parties later stipulated to dismissal of Mr. Peterson. (Order of August 31, 1994.)

2. Mr. March's age discrimination claim need not be tried. As noted below, he is among the plaintiffs who allowed their claims to be dismissed.

3. Ms. Thompson's age discrimination claim had already been dismissed by the court's entry of summary judgment for Hercules.

Orr, Edwin L. Smith, Robert C. Stephens, Sandra L. Van Vleet, Roger E. Wade, Evan D. Warner, and Sherman K. Wood.

## II. Discussion

### A. Elements of an ADEA claim and burden of proof

■ Claims under the ADEA are "subject to the same indirect method of proof used in Title VII cases alleging discriminatory treatment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 770 (10th Cir.1988). For the indirect method, a plaintiff must first present a *prima facie* case of discrimination. *Id.* In a RIF situation, the plaintiff demonstrates a *prima facie* case by showing:

> (1) she was within the protected age group; (2) she was adversely affected by the employment decision; (3) she was qualified for the position at issue; and (4) she was treated less favorably than younger employees during the reduction in force.[4]

*Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1454 (10th Cir.1994).[5]

■ Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for the termination. *Id.* "Evidence that an employer fired qualified older employees but retained younger ones in similar positions is sufficient to create a rebuttable presumption of discriminatory intent and to require the employer to articulate reasons for its decisions." *Branson*, 853 F.2d at 771. However, the defendant "need not persuade the court that it was actually motivated by the proffered reasons, but satisfies its burden merely by raising a genuine issue of fact as to whether it discriminated against the plaintiff." *Rea*, 29 F.3d at 1454–55 (quoting *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1425 (10th Cir.1993)).

■ After the defendant offers evidence of legitimate reasons for the termination, the burden shifts back to the plaintiff to show that the proffered reasons were a pretext for discrimination. *Rea*, 29 F.3d at 1455. "This burden merges with the plaintiff's ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.*

On a motion for summary judgment, the case should go to the factfinder if the plaintiff produces both a *prima facie* case and evidence supporting a finding that defendant's alleged nondiscriminatory reasons for the employment decisions are pretextual. *Ingels v. Thiokol Corp.*, 42 F.3d 616, 622 (10th Cir.1994.)

For purposes of this motion, Hercules concedes that the plaintiffs could satisfy the first three elements of a *prima facie* case. Hercules' position is that none of the plaintiffs can show that they were treated less favorably during the RIF than younger employees or that the reasons it gave for terminating them were pretexts for age discrimination.

### B. Evidence that the plaintiffs were treated less favorably during the RIF

The plaintiffs maintain that Hercules treated them less favorably during the RIF than younger employees in at least one of four ways: (1) older employees were denied opportunities to transfer

---

**4.** A plaintiff need not show that he or she was "as qualified" as the retained workers to establish a *prima facie* case. *Branson*, 853 F.2d at 771 n. 6.

**5.** According to Tenth Circuit precedent, the fourth element may also be shown by "evidence, circumstantial or direct, from which a fact-finder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *Jones v. Unisys Corp.*, 54 F.3d 624, 630 (10th Cir.1995);

*Branson*, 853 F.2d at 771 (quoting *Williams v. General Motors Corp.*, 656 F.2d 120, 129 (5th Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982)). Of course, "the plaintiff's offering of direct evidence of discrimination renders unnecessary and inapposite the inferential case that is built on circumstantial evidence." H. Eglit, 2 *Age Discrimination* § 7.20 n. 548 (1995).

In any event, the plaintiffs' contention in this case is that they were each treated less favorably than younger employees.

which were offered to younger employees; (2) older employees were transferred to "jobs" that were then eliminated; (3) supervisors manipulated the rankings to place older employees who had better performance records below younger employees; or (4) older employees were terminated while younger, less-qualified employees were retained. (Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment at 1.)

Following is a summary of the evidence each plaintiff produced to show that he or she was treated less favorably than younger employees:

### 1. James W. Andrew

■ At the time of his termination, James W. Andrew was 58 years old and worked as an engineer in the Navy Projects/Systems Engineering Department, P300. He reported to Herbert Holt, manager of the department. Holt completed a ranking of qualifications of the engineers in his department; Andrew ranked 19th out of 23 engineers. The five employees with the lowest rankings were terminated. All of the employees who were retained were younger than Andrew.

Holt testified in his deposition that all of Andrew's job functions were reassigned to employees over the age of 50, but three engineers from other departments were transferred to Navy Projects/Systems Engineering, and all three were 40 years of age or younger.

This evidence is sufficient to raise an issue of fact as to whether Andrew was treated less favorably during the RIF than younger employees.

### 2. Wallace D. Bath

At the time of his termination, Wallace D. Bath was 59 years old and worked as a technician in the Hazards Test area. The only other technician assigned to the Hazards Test area was Ron Olsen. Bath, Olsen, and three technicians who worked in the Sensitivity Lab, reported to George Perry who reported to Floyd Davis. Davis ranked the five technicians and a sixth technician, M. Jay Brown, who was then working in the Sensitivity Lab on "loan" from the Standards Lab. Bath ranked 4th of the 6; Brown ranked 5th. Brown, age 32, was sent back to the Standards Lab. Bath and the 6th-ranked technician, age 41, were terminated.

Davis testified that most of Bath's duties were assumed by the 2nd and 3rd–ranked technicians, ages 39 and 56 (both of whom were younger than Bath). Approximately eighteen months after Bath's termination, two technicians were brought to work temporarily in the Hazards Test area, on "loan" from other departments. Both of those technicians were under the age of 40.

This evidence is sufficient to raise an issue of fact as to whether Bath was treated less favorably during the RIF than younger employees.

### 3. Ronald K. Carter

■ At the time of his termination, Ronald K. Carter was 51 years old and worked as an industrial engineer in the Manufacturing/Process/Tool Engineering Department. The former manager of his department ranked Carter's qualifications with one other industrial engineer in the department, Richard Olsen, who was two years older than Carter. Carter ranked 2nd. Olsen was retained when Carter was terminated.

In these circumstances, Carter has not raised a genuine issue of material fact as to whether he was treated less favorably than younger employees.

### 4. Howard H. Christy

At the time of his termination, Howard H. Christy was 54 years old and worked as Programs Support Manager. In mid–1991, Christy was ranked by Garry Kershaw, Hercules' Business Operations Director, against two other managers: Craig R. Berrett, and Rhonda E. Clayton, both of whom were under age 40. Christy ranked 1st. Clayton's position was reduced from manager to supervisor.

In late 1991 or early 1992, Kershaw again ranked the remaining two managers, Christy and Berrett, this time in anticipa-

tion of a reduction in force. Christy ranked 2nd and was terminated; Berrett remained employed.

This evidence raises an issue of fact as to whether Christy was treated less favorably during the RIF than younger employees.

### 5. *Douglas R. Cummings*

At the time of his termination, Douglas R. Cummings was 56 years old and worked as a supervisor of Management Systems Support, a subgroup of Department 8500, Management Information Systems. Cummings was ranked against the two other supervisors in his department: James A. Crump, age 46, and James D. Barratt, age 60. Crump, who was youngest, ranked 1st; the other two were terminated.

As part of a reorganization of the company, Department 8500 was eliminated. Some of the employees in the department were transferred to other departments. All who were transferred were younger than Cummings: Higley, age 36; Johnson, age 42; Crump, age 46; Bowman, age 55; Burgon, age 48; Rowley, age 31; and Workman, age 47.

This evidence is sufficient to raise an issue of fact as to whether Cummings was treated less favorably during the RIF than younger employees.

### 6. *Florence E. Gallegos*

At the time of her termination, Florence E. Gallegos was 62 years old and worked as a prototype developer or pattern cutter in Department 2800, Air Force Project Operations. She was ranked 5th of 6 pattern cutters in her department. The three lowest ranking employees were terminated during the RIF. The three remaining pattern cutters were all younger than Gallegos: Sawyer, age 29; Nelson, age 34; and Head, age 36.[6]

Gallegos has raised an issue of fact as to whether she was treated less favorably than younger employees.

---

6. The two pattern cutters who were terminated with Gallegos were also younger: Murphy,

### 7. *R. Thomas Giuli*

■ At the time of his termination, R. Thomas Giuli was 56 years old and worked as an engineer in the Titan Project Engineering Department. He was ranked 9th out of 15 engineers. (He was also ranked 41st out of a group of 63 engineers.) Of this group, only he and the 15th–ranked engineer, who was 34 years old, were terminated during the RIF. By the close of 1991, approximately half of Giuli's duties had ended. His supervisor, Kay Dickerson, explained that Giuli's work on "mass properties" was also coming to an end, so his job could be eliminated.

One of the engineers who was retained was two years older than Giuli; the rest were younger.

In these circumstances, Giuli has not raised a genuine issue of fact as to whether he was treated less favorably than younger employees.

### 8. *Evelyn S. Green*

■ At the time of her termination, Evelyn S. Green was 46 years old and worked as an accounting clerk in the Quality Assurance Department. Her supervisors ranked her 3rd in a group of 14 employees who handled documentation and paperwork. The 1st, 3rd and 8th through 14th–ranked employees were terminated during the RIF. The department manager, Richard Leonard, testified that Green's job was eliminated as part of a decision to reduce indirect or overhead charges and to revise the way the department performed budgetary work.

All but one of the terminated employees were younger than Green; two older employees were retained. A younger employee was transferred into the department.

In these circumstances, Green has not raised a genuine issue of fact as to whether she was treated less favorably than younger employees.

---

age 26, and Schmalz, age 31.

### 9. E. Thomas Hall, Jr.

At the time of his termination, E. Thomas Hall, Jr., was 57 years old and worked as Facilities Administrator for Office Facilities in Department 8500. Department 8500 was eliminated during the reorganization of the company that accompanied the RIF. Hall's position was eliminated, and he and the 42–year–old planning specialist against whom he was ranked, were both terminated. He questions why he was ranked against a planning specialist.

As noted above, some of the employees in Department 8500 were transferred to other departments. All who were transferred were younger than Hall: Higley, age 36; Johnson, age 42; Crump, age 46; Bowman, age 55; Burgon, age 48; Rowley, age 31; and Workman, age 47.

Hall has raised an issue of fact as to whether he was treated less favorably than younger employees.

### 10. Teri B. Hill

At the time of her termination, Teri B. Hill was 44 years old and worked as a training representative with the Plant 2 Quality Improvement Recommendation Program. She was ranked last of 3 training representatives. The other two were retained when she was terminated. One of the retained employees, Don McKinnon, was younger than Hill; however, the other employee was a little older.[7]

This evidence is insufficient to raise a genuine issue of fact as to whether Hill was treated less favorably than younger employees.

### 11. Irvin M. Hillman

At the time of his termination, Irvin M. Hillman was 40 years old and worked as a foreman in the finishing area. He was ranked last of a group of 7 foremen or supervisors. He and the 6th–ranked employee, a 29–year–old man, were both terminated. A man three years older than Hillman was retained.

Hillman has not raised a genuine issue of fact as to whether he was treated less favorably than younger employees.

### 12. Paul J. Hoover

At the time of his termination, Paul J. Hoover was 53 years old and worked as a shift foreman on the SRAM Machining and Winding Program in the Manufacturing Department at Plant 2. He was ranked 34th in a group of 36 shift foremen, of whom he was the oldest. The seven foremen with the lowest rankings were terminated during the RIF. Their ages were 27, 34, 36, 52, 53, 37, and 55. Of those foremen who were retained, three were in their 50's and six were in their 40's.

Hoover testified that his duties were assumed by Bernard Doliwa who was nine years younger than Hoover.

He raised an issue of fact as to whether he was treated less favorably than younger employees.

### 13. Harold L. McNee

At the time of his termination, Harold L. McNee was 62 years old and worked as a shift supervisor. He was ranked 4th of 6 shift foremen/supervisors. The three lowest ranking employees were terminated during the RIF. All three employees who were terminated were older than the three who were retained. McNee's duties were assumed by Ken Hart, age 33.

This evidence raises an issue of fact as to whether McNee was treated less favorably than younger employees.

### 14. Robert K. Nielsen

At the time of his termination, Robert K. Nielsen was 59 years old and worked as a technician in Matrix Technology, H720. He was ranked last among 10 employees; the two with the lowest rankings were terminated during the RIF. The two who were terminated were also the oldest of the ten employees.

7. Hill argues that she ranked higher than McKinnon on two prior occasions. Her supervisor, Neil Phillips, does not know why the rankings were changed or how the final ranking was derived.

This evidence raises an issue of fact as to whether Nielsen was treated less favorably during the RIF than younger employees.

### 15. M. William Orr

At the time of his termination, M. William Orr was 60 years old and worked as a supervisor and quality coordinator in the Rocket Technology Department, H400. He was ranked 26th among 28 employees in his department. He and the 25th–ranked employee, who was 50 years old, were terminated during the RIF. The 27th and 28th–ranked employees were retained; their ages were 32 and 38.

This evidence raises an issue of fact as to whether Orr was treated less favorably during the RIF than younger employees.

### 16. Edwin L. Smith

■ At the time of his termination, Edwin L. Smith was 54 years old and worked as a process engineer in Manufacturing/Process/Tool Engineering, Department 1100. He was ranked 28th out of 30 employees. Six of these employees were terminated during the RIF; they ranked 23rd and 26th through 30th. The 24th and 25th–ranked employees (who were retained) were older than the 23rd–ranked employee and three of the other employees who were terminated. Two of the employees who were retained were older than Smith.

Smith argues that he should not have been ranked against employees in the department who were not process engineers. He questions why his qualifications were not compared with those of three other process engineers who performed essentially the same type of work. However, he does not offer any evidence of those engineers' ages or treatment during the RIF.

In these circumstances, Smith has not raised a genuine issue of fact as to whether he was treated less favorably during the RIF than younger employees.

### 17. Robert C. Stephens

At the time of his termination, Robert C. Stephens was 57 years old and worked as a lead management systems analyst in Department 8500. As part of a reorganization of the company, Department 8500 was eliminated. Stephens was ranked 2nd against one other systems analyst, Paul V. Rowley, age 31. Stephens was terminated. All of the employees who assumed Stephens' duties were under the age of 40.

This evidence raises an issue of fact as to whether Stephens was treated less favorably than younger employees.

### 18. Sandra L. Van Vleet

At the time of her termination, Sandra L. Van Vleet was 60 years old and worked as a salary administration specialist in the Human Resources Department. The department was reorganized, and her position, considered "one of a kind," was eliminated. After the reorganization, all employees working in the department were younger than Van Vleet.

This evidence raises an issue of fact as to whether Van Vleet was treated less favorably during the RIF than younger employees.

### 19. Roger E. Wade

At the time of his termination, Roger E. Wade was 57 years old and worked as an engineer in Mechanical/Facilities/Tooling, Department 2900. He was ranked last of 9 engineers in the department. He was the oldest and the only one to be terminated during the RIF.

This evidence raises an issue of fact as to whether Wade was treated less favorably than younger employees.

### 20. Evan D. Warner

At the time of his termination, Evan D. Warner was 57 years old and worked as an engineering technician in the Quality Assurance Department. All the technicians in his department were terminated during the RIF. Their duties were assumed by engineers.

Warner says he wanted to bid for a posted job opening but was told that Hercules would no longer transfer employees during the RIF. Meanwhile, a 30–year–old

engineer was permitted to transfer into Warner's department.[8]

Warner raised an issue of fact as to whether he was treated less favorably than younger employees.

### 21. Sherman K. Wood

At the time of his termination, Sherman K. Wood was 59 years old and worked as a spare parts coordinator in the End Item Planning/Acquisition Department. He was ranked last among 7 employees in the department who were materials coordinators or planner/schedulers. His position, which was not full-time, was eliminated. Wood was the only one of the seven to be terminated; four of the six who remained were over the age of forty, and one of them was three years older than Wood.

Wood's duties were assumed by an associate planner who was 37 years old.

This evidence raises an issue of fact as to whether Wood was treated less favorably than younger employees.

\* \* \* \* \* \*

Thus, all but six of the remaining 21 plaintiffs produced evidence on which a factfinder could conclude that they were treated less favorably than younger employees. *See Jones v. Unisys Corp.,* 54 F.3d 624, 630–31 n. 6 (10th Cir.1995).

### C. Hercules' stated reasons for terminating the plaintiffs

As to those plaintiffs who could make a *prima facie* showing, the burden would shift to Hercules to articulate a legitimate, nondiscriminatory reason for their termination.

Hercules points to evidence that in recent years, there has been an economic downturn in the aerospace industry. The government has terminated, cancelled, or delayed several of its major contracts with Hercules, forcing Hercules to reduce expenses. An outside consultant, Mr. Litras, was retained to propose ways to "right-size" the corporation.

Among other proposals, Mr. Litras recommended a RIF. With his help, Hercules created a program called Operations Profitability Improvement (OPI) for determining which jobs to eliminate. Hercules' Director of Human Resources, Mr. Currie, drafted a new RIF policy which was approved by Chief Operating Officer and Chairperson of the Corporate Personnel Policy Committee, F.L. Buckner, and distributed to the general managers of each of Hercules' divisions. A Policy Compliance Committee (PCC) was created to review all RIF recommendations and assure that the "specific practices and procedures used to identify and select persons for separation are in compliance with Corporate policies and all applicable laws and regulations (including, but not limited to: EEO, ADEA, ERISA, COBRA, etc.)." (Mission statement; *see* ¶ 10, Currie Affidavit.)

Mr. Litras and Mr. Currie conducted PCC training for each of Hercules' divisions. According to RIF procedures, the local organization would first determine the number of employees to be laid off and the types of jobs to eliminate. The employees in that organization would then be ranked, primarily on performance. However, if performance and other criteria were equal, the older employee was to be retained. (RIF Policy, § 1.) The organization would prepare a Personnel Displacement List, showing the employees it planned to terminate.

The local organization would then schedule a meeting with the PCC, which consisted of three members: a corporate employee relations representative (Mr. Currie), a divisional human resources representative, and legal counsel. At the meeting, location managers would explain the basis for each of their RIF recommendations. The PCC would review the organization's Displacement List and the information offered by local managers in support of their recommendations. If the PCC found that

---

8. Hercules responds that only engineers were transferred. Warner was not as qualified as an engineer, and no technicians were transferred.

written documentation and comments from management did not support the selection of a particular employee for a RIF, it would not approve the recommendation.

If the PCC approved a particular RIF recommendation, the local organization would complete the termination of that employee. If the PCC did not approve, management would need to develop new alternatives or provide additional facts to support its recommendation at the next PCC meeting.[9]

Mr. Currie states that he attended the PCC meetings at which RIF recommendations were presented for each of the plaintiffs in this lawsuit. He says that, before any plaintiff was laid off, the PCC assured itself at these meetings that each plaintiff's ranking was supported by the information presented to it. (*See* Personnel Displacement Lists corresponding to the PCC meeting during which the PCC approved each plaintiff's selection for the RIF; Ex. 2 to Currie Affidavit.)

Thus, Hercules offered evidence of an economic need to reduce its force and a nondiscriminatory procedure which it sought to implement in carrying out the RIF. It says its reasons are the same as the reasons advanced by the defendant in *Rea:*

> (1) economic conditions within the aerospace industry dictated mass layoffs, and (2) lay-off decisions were based on departmental rankings and Plaintiff was ranked at the bottom of her labor grade.[10]

29 F.3d at 1455.

### D. Evidence that Hercules' stated reasons were a pretext for age discrimination

The plaintiffs have not offered any statistical evidence showing that Hercules' RIF had a disparate impact on older employees generally. Rather, they argue that "the manner in which these particular plaintiffs were chosen for reduction-in-force shows that defendant's proffered business reasons are pretextual and that their employment was terminated because of illegal discriminatory motives." (Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment at 2.)

Similarly, the plaintiffs do not argue that the PCC's RIF policy itself was discriminatory, but rather, that "the decision making process at the departmental level" was discriminatory. (Plaintiffs' Memorandum at 138.) They contend that Hercules' proffered reasons for their terminations are not credible, as shown by: (1) managers' manipulation of final rankings in order to "rid themselves of older workers"; (2) inconsistencies or irregularities in implementing RIF procedures; (3) termination of older employees while retaining younger employees with lower rankings or PARs; and (4) disparaging comments about older employees made by supervisors or management. (*See* Plaintiffs' Supplemental Memorandum at 35–36.)

#### 1. Managers' manipulation of final rankings

As evidence that the final rankings of employees were manipulated, the plaintiffs constructed certain charts, comparing some of their own prior Performance Appraisal Reports (PARs) to the PARs of employees against whom they were ranked. They constructed the charts by: (1) assigning numerical values to portions of the PARs that evaluated certain areas of performance; (2) averaging those numerical values; and (3) comparing the average values to the final rankings used by Hercules.

Hercules maintains that these PAR comparisons are flawed for several reasons. PARs were intended to assess the performance of an individual employee in his particular job duties at a given time; they

---

9. There was also a procedure for management to appeal a PCC refusal to approve a RIF recommendation.

10. However, as discussed below, some of these plaintiffs were ranked higher than employees who were not terminated.

were not designed to compare one employee's performance to another's. Because the PARs of the employees in a given department or area were often completed by different supervisors, the PARs have wider variations, depending upon who wrote them. Some managers tended to give higher scores than others, and some managers evaluated their employees in more areas of performance. Also, the plaintiffs' PAR comparisons ignore written comments in which managers discussed the employee's strengths or weaknesses in greater detail.

The final rankings which Hercules' managers and supervisors prepared in anticipation of the RIF differed from the PARs:

> RIF ranking involved first identifying functions that would remain after the RIF and, second, ranking employees in appropriate groups from "best" to "least best" with regard to the skills needed to perform those functions that would remain. With every succeeding RIF, diversity of skills became more important. Although the regular annual PARs were instructive in some instances, they were one of many tools to determine which particular employees could be counted upon to keep the plant running after the RIF.

(Reply Memorandum in Support of Motion for Summary Judgment at 6–7.)

The plaintiff in *Fallis v. Kerr–McGee Corp.*, 944 F.2d 743 (10th Cir.1991), argued that his final ranking was not an accurate reflection of his abilities and that he was better qualified than certain younger employees. The court reasoned:

> The trouble with these arguments is that they are merely general disagreements with [the employer's] evaluation of which [employees] were best able to guide the company through a difficult economic time. *Under the law of this circuit, even if the jury chose to believe plaintiff's assessment of his performance rather than [his employer's], that choice, standing alone, does not permit a conclusion that [the employer's] ver-*

*sion was a pretext for age discrimination.*

*Id.* at 747 (emphasis added). *See also Branson*, 853 F.2d at 772 ("As courts are not free to second guess an employer's business judgment, this assertion [that plaintiff was equally or more qualified than the people retained] is insufficient to permit a finding of pretext.")

The court agrees that the plaintiffs' PAR comparisons are insufficient to support an inference of intentional age discrimination and that giving much weight to those comparisons would be tantamount to stepping into the shoes of Hercules' managers and second-guessing their business judgment.

### 2. Inconsistencies or irregularities in implementing RIF procedures

■ As the Tenth Circuit explained in a Title VII case, evidence of "disturbing procedural irregularities" may be relevant to show pretext. *Colon–Sanchez v. Marsh*, 733 F.2d 78, 81 (10th Cir.), *cert. denied*, 469 U.S. 855, 105 S.Ct. 181, 83 L.Ed.2d 115 (1984). However, the plaintiffs in this case have not pointed to evidence of any "disturbing" irregularity that would provide a sufficient basis for a jury to find pretext for age discrimination. They have offered some deposition testimony to support their argument that certain "supervisors were given little or no direction regarding how to rank employees or, alternatively, were given conflicting instructions which permitted supervisors to rely on their own subjective judgment when ranking employees." (Plaintiffs' Memorandum at 139–140.)

The plaintiff made a similar argument in *Ingels v. Thiokol Corp.*, 42 F.3d 616, 622 (10th Cir.1994). He pointed to alleged inconsistencies in the testimonies of two key decision-makers as evidence that the defendant/employer was lying about the reasons for his termination. The first alleged inconsistency was in the process by which the two decision-makers chose the employees who would be terminated; one ranked the employees, while the other merely sup-

plied the names of the two most expendable employees in his department. The Tenth Circuit did not see any evidence of pretext in this inconsistency:

> To the extent there is any inconsistency at all, it goes only to *process* and not to purpose or motivation, and could not provide a sufficient basis for a jury to find pretext for age discrimination.

*Id.* at 623.

As Hercules points out, the ADEA does not require that RIF decisions be "objective" or reasonable to all outside observers, only that they not be based on age.

In a similar case, the plaintiffs argued that "retention criteria were inconsistently applied and were manipulated so that older employees could be terminated." *Lucas v. Dover Corp., Norris Div.*, 857 F.2d 1397, 1402 (10th Cir.1988). However, the record showed only that certain subordinates may not have considered all the criteria they were instructed to consider. The court reasoned that any inconsistency was insubstantial where the final decision rested with another supervisor.

Mr. Currie, Hercules' Chairman of the PCC, testified:

> The PCC approved the reduction in force recommendations for each of the plaintiffs in this lawsuit. Before any plaintiff was RIFFed, the PCC assured itself that the ranking of that plaintiff was supported by the information presented to it.

(¶ 16, Affidavit of R. Robert Currie, Jr.).

Any inconsistency in individual managers' application of the RIF policy seems insubstantial where the final decision was reviewed and approved by Mr. Currie and two other members of the PCC.

### 3. Termination of older employees while retaining younger employees with lower rankings

Evidence that a plaintiff who was terminated was more qualified than younger employees who were retained, can also be the basis for an inference of pretext. *See Rea*, 29 F.3d at 1457.[11]

A number of these plaintiffs rely on the PAR comparisons they constructed, as evidence that they were more qualified than a younger employee who was retained. For example, James W. Andrew points to a PAR comparison as evidence that a younger engineer, Theodore Omer, was less qualified but was retained during the RIF.[12] However, his supervisor explained that he ranked Andrew below Omer because Andrew's interpersonal skills and technical capability were weaker than Omer's. (Affidavit of Herbert L. Holt, ¶¶ 5 & 9; Holt Depo. at 47.)

Florence E. Gallegos argues that comparison of the PARs of the six pattern cutters against whom she was ranked, indicates that she had a better PAR than Earl Nelson, a younger employee who was retained. However, she acknowledged that she was the last of the pattern cutters to be certified and that Nelson had more experience at the job.

Paul J. Hoover argues that his PARs were better than those of Bernard Doliwa, a younger employee who was retained. Hercules points out that Doliwa received 12 scores of "exceeds requirements" whereas Hoover received no such scores on his 1991 PAR.

As discussed above, the plaintiffs' PAR comparisons are insufficient to support an inference of pretext and should not be used to second-guess the business judgment of Hercules' managers and supervisors.

---

**11.** On the other hand, evidence of a plaintiff's satisfactory work performance is not probative of pretext. Someone has to be terminated in a RIF situation, including satisfactory employees. *Rea*, 29 F.3d at 1456.

**12.** Andrew also claims that he ranked 14th in an "original" ranking of employees, but Holt testified that he was not familiar with that document and had no idea who prepared it.

Certain plaintiffs did receive higher final rankings than a younger employee who was terminated. For example, Evelyn S. Green was terminated even though she ranked higher on the final rankings than two younger employees who were retained. Her manager decided that her job could be eliminated in a reorganization of the department, and Green conceded that the employee who assumed her duties had valuable computer skills that she lacked.

M. William Orr was terminated even though he ranked higher than two younger employees who were retained. The manager of his department decided to eliminate Orr's position because a considerable amount of his time was charged to overhead expenses, which his supervisors were trying to reduce, and because his duties in supervising and quality control overlapped with the duties performed by supervisors of other groups, who could easily assume those duties.

Howard H. Christy was ranked above a younger employee, Craig Berrett, in an original ranking prepared in mid–1991. In the final rankings, prepared in late 1991 or early 1992, he was ranked below Berrett. His supervisor, Mr. Kershaw, explained that he ranked Christy lower on the final rankings for two main reasons: Christy's management position could be eliminated so that employees under him reported directly to Kershaw, and Christy needed to improve in such areas as attendance and familiarity with cost accounting and financial systems. (Kershaw Affidavit, ¶ 6.) Christy recalled discussing these issues with Kershaw and did not think Kershaw was biased against him on the basis of his age. Kershaw, age 51, took over Christy's supervisory duties.

Thus, Hercules responded with valid business reasons for the decision to terminate each plaintiff, and none of the plaintiffs presented evidence that he was *more* qualified to perform functions that would remain after the RIF than a younger employee who was retained.

### 4. Disparaging comments about older employees

■ Hercules' Equal Employment Opportunity manager, Patricia Ninomiya, testified that Hercules' Directors of Human Resources, Mr. Weber and Mr. Peterson, made certain derogatory comments regarding older workers. The plaintiffs argue that the discriminatory attitudes of Weber and Peterson "sent a clear statement to many managers that getting rid of older workers was not only permissible, but was laudatory." (Plaintiffs' Supplemental Memorandum at 35.)

Ninomiya said that Weber "referred to women in our group who were older who came back to work as old housewives that were coming back to work on their second leg." (Appendix to Plaintiffs' Supplemental Memorandum, Ninomiya Depo. at 29.) She said Weber was referring to Liz Noren and Twila Pittsinger. *Id.* at 30. She also said that Weber talked about giving another employee, Carl Woodward, a better performance evaluation because Woodward was, in Ninomiya's words, a "young up-comer." *Id.* at 31–32.

As to Peterson, Ninomiya testified that he "had a lot of opinions like Bob Weber did." *Id.* at 39. She gave two examples of statements by Peterson that were based on age. First, Peterson said he couldn't understand why John Gale wasn't taking the RIF or retiring, that he was "old" and "ought to have many other things going on for himself." *Id.* at 39–40. Second, Peterson asked Ninomiya why her brother wasn't taking the RIF, since "he's been here a long time." *Id.* at 40.

■ A "stray remark by someone not in a decision-making position does not establish intent to discriminate." *Jones,* 54 F.3d at 632. Neither Peterson nor Weber were decision-makers for any of the plaintiffs. Ninomiya did not recall any "managers, supervisors, people who were in a position to make decisions about employees" making "any sort of derogatory statements about older workers either in gener-

al or about a specific worker because of their age." (Ninomiya Depo. at 33–34.)

 To show discriminatory animus from disparaging comments, a plaintiff must demonstrate a nexus between the comments and the defendant's decision to terminate her. *Rea,* 29 F.3d at 1457. A causal nexus may be shown if the comments were directed at the plaintiff, at her position, or at the defendant's policy which resulted in her termination. *Id.* The comments of Weber and Peterson were directed at Liz Noren, Twila Pittsinger, John Gale, and Ninomiya's brother—none of whom are plaintiffs.

Moreover, Ninomiya answered "no" when asked if she thought individuals were chosen for the RIF because of their age:

Q. [W]hile you were still an EEO officer and you were involved to whatever extent . . . in the reductions in force, did you ever form the opinion that any individuals . . . were being [terminated] because of their age?

A. No.

(Ninomiya Depo. at 110.)

\*   \*   \*   \*   \*   \*

In these circumstances, the plaintiffs cannot meet their burden of proving that Hercules' stated reasons for terminating them during the RIF were a pretext for intentional age discrimination. The plaintiffs have engaged in extensive discovery and have thoroughly probed the facts related to their allegation of age discrimination. The court's review of the facts and voluminous briefing addressing this issue, reveals no evidence which raises a genuine issue of material fact to support the plaintiffs' position and which finding is necessary to bar entry of judgment in favor of the defendant as a matter of law. *See* Fed.R.Civ.P. 56(c).

### III.   Conclusion

IT IS THEREFORE ORDERED that the defendants' motion for summary judg-

ment is granted as to all remaining plaintiffs.