Roland T. INGELS, Plaintiff–Appellant,

v.

THIOKOL CORPORATION,
Defendant–Appellee.

No. 92–4117.

United States Court of Appeals,
Tenth Circuit.

Dec. 12, 1994.

David H. Schwobe of Perkins, Schwobe & McLachlan, Salt Lake City, UT (Mark C. McLachlan of Perkins, Schwobe & McLachlan, with him on the brief), for plaintiff-appellant.

Janet Hugie Smith of Ray, Quinney & Nebeker, Salt Lake City, UT (Michael E. Blue of Ray, Quinney & Nebeker, with her on the brief), for defendant-appellee.

Before BRORBY, McWILLIAMS, and EBEL, Circuit Judges.

EBEL, Circuit Judge.

Plaintiff–Appellant Roland T. Ingels ("Ingels") appeals the district court's grant of summary judgment to his former employer, Thiokol Corporation, on three claims stemming from Ingels' release from Thiokol in a reduction in force ("RIF"). Ingels claims that Thiokol: 1) discriminated against him based on age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a); 2) breached an implied-in-fact employment contract under state law; and 3) did not rehire him in retaliation for his administrative action against Thiokol, in violation of 29 U.S.C. § 623(d). On appeal, Ingels claims that genuine issues of material fact preclude summary judgment on the age discrimination and state contract claims. In addition, he argues that the district court erred in dismissing his retaliatory non-rehire claim for failure to exhaust administrative remedies. For the reasons stated, we affirm in part, reverse in part, and remand for further proceedings.

## FACTS

Roland Ingels was 64 when Thiokol Corporation dismissed him along with 161 other employees of Thiokol's Strategic Operations Division in July 1989. Ingels had been employed by Thiokol for eleven years at the time of his dismissal. He was employed as an engineer in the Logistics Department, within the Strategic Operations Division, which merged with the Systems Requirement Department to become the Systems Requirements and Logistics Department. Ingels primarily performed logistical support tasks for government missile and rocket programs, and received consistently good reviews during his career at Thiokol.

Nineteen–Eighty–Nine was a turbulent year for Ingels and the Logistics Department at Thiokol. In the spring, Thiokol merged the Logistics Department with the Systems Requirements Department in order to save the cost of having two department heads. Roger Kelly was named the supervisor of the new combined department. Kelly was formerly supervisor of the Systems Requirements Department. At the time that he became Ingels' supervisor, Kelly had little detailed knowledge of the work that the former Logistics Department performed or the backgrounds of its employees.

In June 1989, Thiokol management decided to institute a RIF in the Strategic Operations Division. Thiokol claims that this RIF was necessitated by the partial termination of a contract to build a small I.C.B.M. for the United States Air Force and the general economic downturn in the defense contracting industry at the time.

There is some confusion in the record as to exactly how Ingels was chosen to be one of

the employees for the RIF in June and July of 1991. As discussed, Roger Kelly was the supervisor of the Systems Requirements and Logistics Department and Ingels' immediate boss. Kelly reported to Jesse Scivally, manager of the Design Support Department, who, in turn, reported to D.J. Hammon, Vice President of the Strategic Engineering Division. In his deposition, Scivally testified that Hammon directed him to "totem-pole" the employees in his department—that is, to rank them from most to least expendable in terms of the department's needs. In turn, Scivally claims that he requested Kelly and three other supervisors in his department to "totem-pole" their employees in a similar fashion and report back to him. Upon receiving the "totem-poles" from the four supervisors, Scivally integrated them into an overall "totem-pole" for his Design Support Department. He was told to choose one person from his department for dismissal. Ingels' name was at the bottom of the Kelly and Scivally "totem-poles." Wayne Bennett, a 29 year old engineer for the systems requirements side of the Systems Requirements and Logistics Department, was the next person up from Ingels on the list. When asked what distinguished Ingels from Bennett, Scivally described Bennett as demonstrating more "versatility." Scivally presented Ingels' name to Hammon for the RIF.

Kelly recalled the process somewhat differently. He does not recall actually making a "totem-pole," a term with which he was unfamiliar. Kelly explained that Scivally requested that he identify two individuals for the RIF. He supplied the names of Ingels and Bennett, with Ingels on the line below Bennett. He explained that he did not distinguish between them in terms of priority or value to his department. Kelly indicated that he picked Ingels because Ingels was only performing a task called "standardization" that could easily be completed by other workers.[1] Kelly further described his criteria for picking Ingels and Bennett:

> I went back and thought about the individuals that worked for me and what they did, how important they—the functions they were performing were, whether I could do without that particular function, could it be—is it required by contract; if it was, can it be done by someone else that has—that's doing a function that I also need.

Aplt.App. at 208. Kelly believed that both employees would be dismissed as part of the RIF.

At about the same time that this process was occurring, Hammon's secretary asked Kelly to find out about Ingels' retirement plans. Kelly claims in an affidavit that Hammon's secretary did not identify the purpose of the inquiry, but noted that it was a common inquiry and did not surprise him. Kelly asked one of Ingels' coworkers about Ingels' retirement plans but learned nothing. He did not pursue the topic further. Kelly recalls that he made this inquiry during the first week of July, and that he knew nothing of the RIF until the week afterward.

Ingels, as noted above, was dismissed on July 31, and was the only person let go from the Systems Requirements and Logistics Section. Unlike employees in earlier RIF's, Ingels was not transferred to another part of the Thiokol operation, which Ingels claims was contrary to Thiokol's RIF policy that it had made available to all employees. The RIF policy document stated that Thiokol would retain the employees with the greatest continuous service when all other factors were equal, grant employees prior notice of the RIF, consider terminated employees for transfer, give a preference to terminated employees over new hires, and ensure that an individual termination is appropriate when a terminated employee has greater seniority than a retained employee within the same classification. Ingels also claims that no consideration was taken of his veteran status, as required by Thiokol's affirmative action policy. However, Ingels does not point to any evidence to suggest that he was treated differently than the other 161 employees terminated in this RIF.

After exhausting his administrative remedies by filing a charge with the Utah Anti-

---

1. "Standardization," as defined in Thiokol's brief, involves "tracking parts to ensure they complied with Air Force criteria and serving as a representative on a program/parts control board." Aplee.Br. at 13.

Discrimination Division and the EEOC, Ingels filed a complaint in the United States District Court for the District of Utah, claiming that Thiokol had discriminated against him on the basis of his age in violation of the ADEA, 29 U.S.C. § 623(a), and had violated an implied contract under Utah law that was formed by the Thiokol RIF policy and the affirmative action policy. During discovery, Ingels learned that Thiokol had hired additional employees into the Logistics Department four months after he had been released. He thus amended his complaint to include a retaliatory non-rehire claim under 29 U.S.C. § 623(d) of the ADEA. Ingels did not pursue any administrative action on the retaliatory non-rehire claim.

Thiokol moved for summary judgment pursuant to Fed.R.Civ.P. 56. The district court assumed for the purposes of the summary judgment motion that Ingels had shown a prima facie case of discrimination. The court then found that Thiokol had met its burden of presenting a legitimate, nondiscriminatory reason for its decision to terminate Ingels. However, the district court found that Ingels had not presented enough evidence to suggest that Thiokol's proffered explanations were pretextual:

> Plaintiff points to several contested issues, and to several perceived inconsistencies in the testimony of Thiokol's managers to support his argument of pretext. However, none of these "facts" suggests that age discrimination was in any way a motivation for the termination. Plaintiff offers mere conjecture.

District Court Order of June 30, 1992 at 2.

The district court granted summary judgment on the breach of implied contract claim because it found no genuine issue of fact as to whether the implied-in-fact contract had been created. The district court pointed to the existence of explicit language in the employee handbook which disclaimed the creation of contractual obligations.

Finally, the district court construed the summary judgment motion as a motion to dismiss the retaliatory non-rehire claim and dismissed that claim without prejudice. The district court found that Ingels had failed to file an administrative charge on this claim,

and held that administrative filing is required in cases of failure to rehire because the original discharge and the retaliation are completely separate.

On appeal, Ingels claims that a genuine issue of material fact exists regarding his age discrimination and contract claims, and that administrative filing of a retaliatory non-rehire claim was unnecessary when he had already filed an administrative claim alleging wrongful discharge on the basis of age.

## DISCUSSION

### I. STANDARD OF REVIEW

■ We review the grant or denial of summary judgment de novo, applying the same legal standard used by the district court under Fed.R.Civ.P. 56(c). *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). "Summary judgment is appropriate when there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Russillo v. Scarborough*, 935 F.2d 1167, 1170 (10th Cir.1991). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). However, "[w]e must view the evidence and any possible inferences most favorably to the nonmoving party to ascertain whether a genuine issue of fact exists." *MacDonald v. Eastern Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1117 (10th Cir.1991). We review any legal questions de novo. *Id.* at 1118.

### II. AGE DISCRIMINATION CLAIM

#### A. *Elements of an Age Discrimination Claim*

■ A plaintiff who seeks to prove that an employer discriminated against him or her can use either direct or circumstantial evidence. Ingels primarily offers circumstantial evidence in his case to prove that Thiokol discriminated against him based on his age.

■ Circumstantial proof is often offered in cases alleging discrimination because there is rarely direct evidence of discrimination. To ensure an orderly presentation of circumstantial evidence, this Circuit has adopted the burden-shifting format of proof originally set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff must first prove a prima facie case.

> [T]o set forth a prima facie case of age discrimination, a plaintiff must ordinarily prove that "(1) the affected employee was within the protected age group; (2) [he] was doing satisfactory work; (3) [he] was discharged despite the adequacy of his work; and (4) a younger person replaced [him]."

*Lucas v. Dover Corp., Norris Div.*, 857 F.2d 1397, 1400 (10th Cir.1988) (alteration in original) (quoting *E.E.O.C. v. Sperry Corp.*, 852 F.2d 503, 507 (10th Cir.1988)). This test has been somewhat modified in a reduction-in-force context because the discharged employee is not always replaced with another employee. Thus,

> courts have modified the fourth prima facie element by requiring the plaintiff to "produc[e] evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." ... This element may be established through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the reduction-in-force.

*Id.* (alteration in original) (quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 771 (10th Cir.1988)).[2] "Evidence that an employer fired qualified older employees but retained younger ones in similar positions is sufficient to create a rebuttable presumption of discriminatory intent...." *Branson*, 853 F.2d at 771.

■ In order to rebut this presumption, the employer must assert, in a reasonably specific and clear manner, " 'some legitimate, nondiscriminatory reason for the employee's rejection.' " *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir.1992) (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824).

> The defendant's burden is merely to articulate through some proof a facially nondiscriminatory reason for the termination; the defendant does not at this stage of the proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion.

*Id.* at 1316 (footnote omitted). After the defendant meets the burden of producing a facially nondiscriminatory reason for the employment decision, the presumption of discrimination established by the prima facie showing "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). The plaintiff then carries the full burden of persuasion to show that the defendant discriminated on the illegal basis of age. The plaintiff may do so by either showing that the proffered reason is a pretext for illegal discrimination, or by providing direct evidence of discrimination.

■ If the plaintiff produces evidence that the defendant's proffered nondiscriminatory reasons are pretextual,

> [t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, ... "[n]o additional proof of discrimination is *required.*"

*Id.* (emphasis in original). Thus, a factfinder may, but is not required to, find discrimination when a plaintiff presents evidence that the defendant's proffered reasons are unwor-

---

2. Neither party questions whether Ingels has made out a prima facie case. Thus, we will not review the district court's assumption that Ingels has produced enough evidence to raise an issue of fact regarding his prima facie case. District Court Order of June 30, 1992 at 1.

thy of credence. *See also, Flasher,* 986 F.2d at 1320.[3]

 However, this case arrives to us at the summary judgment stage. At that stage, if a plaintiff advances evidence establishing a prima facie case and evidence upon which a factfinder could conclude that the defendant's alleged nondiscriminatory reasons for the employment decisions are pretextual, the case should go to the factfinder. *Durham v. Xerox, Corp.,* 18 F.3d 836, 839–40 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 80, 130 L.Ed.2d 33 (1994); *Merrick v. Northern Natural Gas Co.,* 911 F.2d 426, 429 (10th Cir. 1990). *Accord Batey v. Stone,* 24 F.3d 1330, 1334 (11th Cir.1994); *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1123–24 (7th Cir.1994); *Washington v. Garrett,* 10 F.3d 1421, 1433 (9th Cir.1993) ("If a plaintiff succeeds in raising a genuine factual issue regarding the authenticity of the employer's stated motive, summary judgment is inappropriate, because it is for the trier of fact to decide which story is to be believed.").

## B. *Ingels' Evidence of Pretext*

Both sides agree that Ingels has made a prima facie case of discrimination for the purposes of this appeal. Further, Ingels does not challenge the district court's finding that Thiokol alleged a valid, nondiscriminatory reason for Ingels' discharge. Thus, on this appeal the sole issue regarding Ingels' age discrimination claim is whether Ingels has presented enough evidence to allow a reasonable jury to conclude that Thiokol's proffered reasons for his discharge were pretextual.

As noted above, Thiokol alleges that the RIF of 162 employees was necessary because of the partial termination of the small I.C.B.M. contract and the decline in the aerospace and defense industry. Thiokol claims that it instructed its managers to determine what functions had to be done in their areas and which of their employees were essential to perform these functions. In addition, they were instructed to determine who had the skills to absorb the remaining duties of the employees who were terminated in the RIF. Thus, Thiokol claims that its managers, Kelly and Scivally, chose Ingels as one of the RIF candidates because he was performing functions that could easily be assumed by others and because others in the department were performing tasks that could not be easily transferred. In particular, Thiokol alleges that Ingels was spending most of his time performing two tasks—standardization and proofreading—that others could take up without difficulty.

 Ingels makes a passing effort to challenge the bona-fide nature of the entire RIF program, but we can easily dismiss that challenge. Although Ingels presents some evidence that the partial cancellation of the I.C.B.M. contract did not affect the workload in his unit or his work, Thiokol does not solely claim that it fired Ingels because work he was doing on the missile program disappeared. Instead, it offered evidence that Thiokol as an organization needed to cut positions because of the lost contract and bad economic conditions in general. Thus, Ingels' evidence that the cutback did not personally affect him is not enough to suggest that the decision to fire workers was pretextual.

Most of Ingels' evidence of pretext focuses on why he personally was chosen for the layoff. In particular, Ingels points to alleged inconsistencies in the testimony of the key decisionmakers—Kelly and Scivally—as evidence that Thiokol may be lying about the reasons it chose to release Ingels. The first alleged inconsistency is between Kelly and Scivally regarding the process by which they chose the names for layoff. As noted above, Scivally claims that he was asked to prepare a totem pole for his department and that he,

---

**3.** We have held that a directed verdict does not necessarily lie for the plaintiff just because the plaintiff can show that the defendant's proffered reasons are unworthy of credence. *Flasher,* 986 F.2d at 1320–21. Pretext *may* support a factual conclusion of discrimination but it does not compel such a conclusion. Pretextual reasons may be offered for reasons other than to conceal a discriminatory motivation. *Id.* at 1321. Thus, establishing pretext gets a plaintiff over the hurdle of summary judgment against it, but it does not entitle the plaintiff to summary judgment because at trial the jury must be convinced that the pretext concealed a discriminatory motive. That ultimate question resides with the trier of fact. *Id.*

in turn, asked the supervisors who reported to him to "totem-pole" their employees so that he could accomplish this task. Kelly, on the other hand, testified that he was unfamiliar with "totem-poles" and that he was merely asked for the names of the two most expendable employees in his department. He claims that he submitted only these two names—Ingels and Bennett—in no order of preference. Kelly claims that he had no part in the decision of whether to retain Bennett over Ingels.

We fail to see in this any evidence of pretext. It is nothing more than recollections by two different employees as to the individual manner in which they carried out their jobs. To the extent there is any inconsistency at all, it goes only to *process* and not to purpose or motivation, and could not provide a sufficient basis for a jury to find pretext for age discrimination. Similarly, the fact that Kelly had some confusion about the extent of Ingels' time spent on standardization does not show pretext, nor does it negate the testimony of those in the chain of decision that they exercised their business judgment in selecting Ingels for the RIF program rather than another employee because of consideration of versatility. *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1426–27 (10th Cir.1993) ("The ADEA is not a vehicle for reviewing the propriety of business decisions."); *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988) (same).

Ingels' other evidence is similarly ineffectual. He asserts that earlier RIF programs were conducted under different rules that would have given him greater rights to transfer to another position within the company. However, as we point out in a subsequent

part of this opinion, Ingels has no contractual right to the preservation of rules used in earlier RIF programs. There is no showing that the rules used in the 1989 RIF program were a pretext for any ulterior motive or that those rules were applied discriminatorily to Ingels. In fact, the evidence is that those rules were applied equally to all 161 employees affected by the 1989 RIF.[4]

Our review of the record satisfies us that the district court was correct in concluding that Ingels has not shown that the 1989 RIF program, as applied to him, was pretextual. Thus, we affirm the district court's grant of summary judgment to Thiokol on this claim.

## III. BREACH OF IMPLIED CONTRACT CLAIM

Ingels claims that Thiokol breached implied-in-fact contracts with him at the time that it terminated him in the RIF. In particular, he claims that two documents—an affirmative action policy and an "Exempt Employees Work Force Reduction" policy—created implied contracts that altered his employment at-will. Ingels claims that the affirmative action policy promised that Thiokol would consider veterans' status as a positive factor in job decisions. In the Force Reduction document, Thiokol stated that, all things being equal, it would retain employees with more seniority, experience, and skill.[5] Thiokol also required the Human Resources Department to review layoff choices when a person being laid off had more service than a retained employee. In addition, the policy states that Thiokol intended to give employees advance notice, opportunities to transfer, and consideration for rehiring. Ingels claims that these policies formed a contract that was breached by Thiokol. Thiokol responds by

---

4. Ingels also suggests that Russell Beals, the director of Thiokol's Human Resources office, looked at age as a factor in deciding whom to RIF, even though Beals did not have a role in specifically choosing Ingels for the RIF. In any event, when Beals' testimony is viewed in context, he was merely saying that he looked to age, like he did to other characteristics to make sure that the RIF program was not structured in such a way as to unfairly burden those groups. In fact, there is no showing that the RIF program did unfairly burden employees based on age.

5. The policy reads, in relevant part:

1. If a permanent reduction in the exempt work force is required, it is the intent of the company to retain the employees with the most experience and skill for the available work and to retain an appropriate distribution of job classifications within the overall salary structure....

4. Where the skills, abilities, and value to the company are equal among the employees being considered for layoff, the employees with the greatest continuous service will be retained. Aplee.Supp.App. at 55.

pointing to a provision in its employee handbook that disclaims the creation of any contract by anything in either the handbook or in "any other personnel materials which may be issued from time to time." Aplt.App. at 50.

■■■ The existence of an implied-in-fact contract in Utah, as the name suggests, is a question of fact that is normally committed to the jury. *James v. Sears, Roebuck and Co., Inc.*, 21 F.3d 989, 998 (10th Cir. 1994); *Sanderson v. First Sec. Leasing Co.*, 844 P.2d 303, 306 (Utah 1992). Nonetheless, on summary judgment, the court retains the power to determine, as a matter of law, whether "a reasonable jury could find that an implied contract exists." *Sanderson*, 844 P.2d at 306. "Unless the terms of an employee manual are ambiguous, the construction of the terms of the contract of employment is a matter of law to be decided by the court." *James*, 21 F.3d at 998 (citing *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 56 (Utah 1991)).

■■■ In Utah, employment for an indefinite period is presumed to be at-will. *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1000 (Utah 1991). However, the Utah courts have recently held that provisions in employee handbooks or other materials can form an implied-in-fact contract that could alter the length or terms of employment. *Hodgson v. Bunzl Utah, Inc.*, 844 P.2d 331, 334 (Utah 1992). However,

> [i]n order for an employer's conduct to create an implied-in-fact contract modifying at-will employment, the conduct must meet the standards of a unilateral offer and acceptance. *Johnson*, 818 P.2d at 1002. The employer must communicate the intent to offer employment other than at will, the communication must be sufficiently definite to act as a contract provision, and the communicated intent must be such that the employee may reasonably

believe that the employment offered is other than at-will.

*Id.* at 334. The alleged agreement must be read as a whole, so that any agreement terms are read in light of any disclaimers. *Johnson*, 818 P.2d at 1003 (finding that a disclaimer identical to that in this case clearly and conspicuously disclaimed the creation of a contract so that no reasonable juror could conclude that a contract had been created).

■■■ We affirm the district court's grant of summary judgment for Thiokol on this issue. We were only provided a fragment of the affirmative action policy in Ingels' brief. Based upon the fragment of the policy available to us, we cannot conclude that the policy is "sufficiently definite to act as a contract provision." *Hodgson*, 844 P.2d at 334. In addition, the employee handbook specifically disclaims any intent that either the handbook or other personnel materials give rise to further contractual obligations.

■■■ In addition, we conclude that the Force Reduction document does not create an enforceable contract. Nothing in the policy document clearly and unambiguously suggests that Thiokol intended to modify its disclaimer that "any . . . personnel materials which may be issued from time to time, do not create a binding contract or any other obligation or liability on [Thiokol]." Thus, we agree with the district court that summary judgment for Thiokol was appropriate as to this issue.[6]

## IV. RETALIATORY NON–REHIRE CLAIM

Finally, Ingels appeals the district court's dismissal of his retaliatory non-rehire claim on the basis that he failed to exhaust his administrative remedy on that claim. Ingels claims that he was not required to file a separate administrative charge for the retaliation claim because the retaliation is related to his discriminatory discharge and occurred

**6.** Thiokol also argues that another disclaimer in the Policy and Procedures Manual should compel summary judgment. The Force Reduction policy document was placed in a "Policy and Procedures Manual" that included the disclaimer that nothing within it created a contract. However, this manual was only available to management, and there is no evidence that Ingels ever saw one of these manuals. We will not grant summary judgment based on a disclaimer he was unlikely to have seen.

during the pendency of the administrative charge.

In this circuit, "[w]hen an employee seeks judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC." *Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 864 F.2d 680, 682 (10th Cir.1988) (alteration in original) (quoting *Oubichon v. North American Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir. 1973)). Further, "an act committed by an employer in retaliation for the filing of an EEOC complaint is reasonably related to that complaint, obviating the need for a second EEOC complaint." *Id.; see also, Butts v. City of New York Dep't of Housing Preservation & Dev.*, 990 F.2d 1397, 1403 (2nd Cir.1993) (plaintiff may raise unexhausted retaliation claim); *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir.1992) (same); *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir. 1989) (same); *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir.1984) (same).

In *Brown*, 864 F.2d at 681–82, the plaintiff had applied for employment with the defendant during successive years. She filed an EEOC charge for discrimination in one of the years, and alleged in her complaint that she was not hired in the next year because of retaliation for filing her charge. The district court dismissed the retaliation claim due to the plaintiff's failure to bring an administrative charge on that claim. We reversed, holding that, if the school district retaliated

against the plaintiff during the pendency of her claim, that act was sufficiently related to the EEOC charge to be properly before the district court. *Id.* at 682.[7]

■ This is a sound rule, because the main functions of the requirement of an EEOC charge have already been fulfilled, and requiring a second trip to the state or federal administrative agencies to allege retaliation occurring during the pendency of a judicial proceeding would not achieve any purpose and would simply prolong and perhaps bifurcate the judicial proceeding. There are two purposes behind the requirement for administrative exhaustion in discrimination cases: 1) to give notice of the alleged violation to the charged party; and 2) to give the EEOC an opportunity to conciliate the claim, which effectuates Title VII's goal of securing voluntary compliance. *Butts*, 990 F.2d at 1401; *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 126 (7th Cir.1989); *Waiters*, 729 F.2d at 237. In the retaliation context, notice has already been given and there is little likelihood that a second administrative complaint would lead to conciliation. *Butts*, 990 F.2d at 1402; *Waiters*, 729 F.2d at 237. "Indeed, requiring a plaintiff to file a second EEOC charge under these circumstances could have the perverse result of promoting employer retaliation in order to impose further costs on plaintiffs and delay the filing of civil actions relating to the underlying acts of discrimination." *Butts*, 990 F.2d at 1402.[8]

■ Thus, the district court erred in dismissing Ingels' retaliation claim for failure to exhaust administrative remedies. On re-

7. The district court erred in analogizing Ingels' situation to cases that have held that a claim for discriminatory failure to rehire is not encompassed in an administrative charge that alleged discriminatory layoff. *See, e.g., Lawson v. Burlington Indus., Inc.*, 683 F.2d 862, 863–64 (4th Cir.), *cert. denied*, 459 U.S. 944, 103 S.Ct. 257, 74 L.Ed.2d 201 (1982). Ingels is not claiming that Thiokol's failure to rehire him was part of the allegedly illegal discharge. Instead, he is claiming that Thiokol retaliated against him for filing this judicial action while this action was pending. Since a judicial claim was already validly in progress, retaliation because of that very claim is adequately related to the underlying claim so as to avoid the necessity of starting a new administrative action.

8. A retaliation claim does not require that the plaintiff prevail on the underlying claim of discrimination. 29 U.S.C. § 623(d) makes it unlawful for an employer to discriminate against an employee who "has made a charge ... under this chapter." *Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir.1989); *Wentz v. Maryland Casualty Co.*, 869 F.2d 1153, 1154–55 (8th Cir.1989). *Cf. Love v. RE/MAX of America, Inc.*, 738 F.2d 383, 385 (10th Cir.1984) (applying this principle in a Title VII anti-retaliation claim); *Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 33 (1st Cir.1990) (same).

mand the district court is, of course, free to examine whether there is a genuine dispute of material fact sufficient to allow that claim to go to the jury.

## CONCLUSION

We AFFIRM the district court's grant of summary judgment against Ingels on his discriminatory discharge claim. We AFFIRM the grant of summary judgment against Ingels on his state law claims. We REVERSE the district court's dismissal of Ingels' retaliatory non-rehire claim. Accordingly, we REMAND for further proceedings in accordance with this opinion.