78 F.3d 598
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 V.J. TOUCHET, Plaintiff-Appellee,
v.
HALLIBURTON COMPANY, a Delaware corporation, Defendant-Appellant.
 No. 94-8042.
(D.C.No. 92-CV-164)
 United States Court of Appeals, Tenth Circuit.
 Feb. 29, 1996.
 
 1
 D.Wyo.
 
 
 2
 AFFIRMED.
 
 ORDER AND JUDGMENT[1]
 
 3
 Before PORFILIO and EBEL, Circuit Judges, and COOK, Senior District Judge.[2]
 
 
 4
 Defendant Halliburton Company ("Halliburton") appeals a jury verdict in favor of Plaintiff V.J. Touchet ("Touchet") on his Age Discrimination in Employment Act ("ADEA") and Wyoming common law claims. Halliburton moved for judgment as a matter of law on each claim before and after the jury's verdict, and also moved for a new trial and remittitur after the entry of the verdict. The district court denied all of these motions and awarded attorney's fees to Touchet. Halliburton filed this timely appeal alleging: 1) insufficient evidence as a matter of law to support the jury's findings of either constructive discharge or intentional employment discrimination; 2) evidentiary errors; 3) erroneous jury instructions; and 4) an erroneous award of front pay rather than reinstatement. Because we reject each of these arguments, we affirm the jury verdict entered by the district court.
 
 I. BACKGROUND[3]
 
 5
 Halliburton employed Touchet from 1963 until February, 1992, at which time Touchet left Halliburton at the age of 53. Touchet held various positions with Halliburton, and, from 1989 until August 1991, he worked as Assistant District Manager of the Casper District and served as "camp head" for the Worland, Wyoming sub-district or camp. Touchet began experiencing heart problems and, in November of 1990, had a pacemaker installed. Touchet discussed his health problems with his supervisor, and Halliburton was aware of his limitations as a result of those health problems. While Touchet was unable to work at the same pace as he had prior to his heart problems, he was fully able to perform his job and continued to receive good performance reviews.
 
 
 6
 In August of 1991, Halliburton decided to down size the Worland operation and explained to Touchet that it had decided to eliminate his Assistant District Manager position. Halliburton also decided to transfer Touchet to Williston, North Dakota as a Field Supervisor, a position formerly supervised by Touchet as Assistant District Manager. Touchet, after being told of this transfer, immediately became ill with chest pains and breathing difficulties, and sought medical care. The next day, Touchet's doctor prescribed medication and recommended medical leave, which Touchet took and remained on until he left Halliburton in February, 1992.
 
 
 7
 Halliburton's decision to eliminate Touchet's position as Assistant District Manager was an economic one, and the position was never filled by anyone else. However, Touchet points out that Halliburton transferred another employee, 37 year-old Karl Madden ("Madden"), to Worland as a Field Supervisor and the new "camp head,"[4] a position that Touchet alleges he could have performed, but was never offered. Instead, Touchet was offered only the opportunity to transfer to Williston as a Field Supervisor. Unlike Worland, Williston was managed by a District Manager as "camp head."
 
 
 8
 During the period from the end of August, 1991, through February, 1992, when Touchet was on medical leave and receiving sick pay, he communicated with the Williston District Manager Jim Harkins ("Harkins") on a weekly basis, updating his medical condition and asking questions about his new position in Williston. Initially, Harkins communicated with Touchet's wife because Touchet's doctor had told him not to communicate with his workplace. However, in late October, Touchet began communicating directly with Harkins.
 
 
 9
 This first communication between Touchet and Harkins related to a new Halliburton early retirement plan--the "bridge to retirement." Under this voluntary plan, workers who were at least 52 years old were allowed to take early retirement with some additional benefits not normally available to early retirees. The plan was intended to provide an incentive to qualified workers to voluntarily retire early and, thereby, contribute to the company's down sizing. Because this special "bridge" program expired in December, 1991, supervisors were instructed to follow up with qualified employees to ensure that they had received a copy of and understood the "bridge" program. As a potentially qualified employee, Touchet received a copy of the plan. Harkins asked if he had received and understood it, and Touchet replied he had received it. After this initial conversation, Harkins continued in his weekly calls to ask Touchet if he was going to take the bridge to retirement. Harkins also suggested that Touchet and his wife come up to Williston for three days, stay in a hotel, and just hang around the office, so that Touchet would technically be on active duty and qualified for the "bridge" program. However, Touchet did not consider the bridge to be a good option for him because he did not want to retire during this period.
 
 
 10
 At this same time, Touchet began asking Harkins about the field supervisor position Touchet was being transferred to in Williston. Harkins was unsure exactly where he would place Touchet, but told him that he would be driving quite a bit, frequently out "in the boondocks." Based on Harkins's description of working conditions in Williston, Touchet expected that his new field supervisor position would be very similar to the work he had performed in previous years as a field supervisor in other locations. In response to Harkins's comment that Williston might be in a business downturn that could result in layoffs, Touchet asked whether he would still have a job in such a downturn. Harkins responded that, under such circumstances, Touchet might be demoted to "special operator." Because of a previous back injury, of which Halliburton was aware, Touchet felt certain that he could not do this job--a job involving heavy lifting. Harkins generally failed to point out any positive aspects of the transfer, instead focusing entirely on the negative aspects. Touchet felt like Halliburton was trying to encourage him to retire.
 
 
 11
 After the deadline for taking the bridge program expired, Harkins suggested that Touchet consider medical retirement. Touchet was not yet qualified for medical retirement because he had not yet been on sick leave for six months; however, Harkins arranged to have this six month requirement waived in Touchet's case. Again, Touchet felt that Halliburton was trying to get rid of him despite his desire to continue working.
 
 
 12
 On January 28, 1992, Touchet received a letter from his doctor stating that Touchet was "medically capable of employment with [Halliburton] according to his previous job description or even one with less stress." Appellee's App., Vol. 3 at 588. However, the doctor further observed that "[d]ue to [Touchet's] reaction to stress I feel it is questionable whether or not he should be place [sic] in a field supervisor position." Id. Touchet's doctor testified at trial that the letter refers to the field supervisor position in Williston as "questionable," but that Touchet was medically fit to perform his old job as "camp head"[5] in Worland. After receiving this letter, Touchet wrote a letter to Halliburton tendering his application for full medical retirement. In his letter, Touchet explained that he was retiring because he believed, on advice from his doctor, that the job he was being transferred to in Williston was beyond his physical and health capabilities; however, he believed he was still qualified for other positions with Halliburton, including his old job in Williston. Halliburton granted Touchet's request for full medical retirement in February 1992.
 
 
 13
 Touchet then brought this action alleging that Halliburton intentionally discriminated against him because of his age in violation of the ADEA, 29 U.S.C. 623, and alleging common law breach of contract based on constructive discharge in violation of an implied contract for employment. The case was tried to a jury, except for the equitable issue of whether to award reinstatement or frontpay under the ADEA, which was tried to the court employing an advisory jury pursuant to Rule 39(c). The jury returned a verdict for Touchet on both causes of action, awarding him damages of $441,266, and the court entered judgment in that amount.
 
 
 14
 Halliburton argues on appeal that: (1) Touchet's evidence at trial was legally insufficient to support a finding of age discrimination or, alternatively, was against the great weight of the evidence; (2) Touchet's evidence at trial was legally insufficient to support a finding of constructive discharge or, alternatively, was against the great weight of the evidence; (3) the district court erred in admitting the against comments attributed to Joe McCalla; (4) the district court erred in excluding a statement of at-will employment signed by Touchet; (5) the district court erred in its instructions to the jury; and (6) the district court erred in awarding front pay rather than reinstatement. Halliburton preserved all of these issues through appropriate evidentiary objections during trial, a motion for judgment as a matter of law at the close of evidence, and a renewal of its motion for judgment as a matter of law, or, alternatively, a motion for a new trial, after the jury verdict.
 
 II. DISCUSSION
 A. Constructive Discharge
 
 15
 In reviewing the district court's decision to deny Halliburton's motion for judgment as a matter of law and to submit the issue of constructive discharge to the jury, we review the question de novo, "view[ing] the evidence most favorably to the non-moving party and giv[ing] that party the benefit of all reasonable inferences to be drawn from the evidence." James v. Sears, Roebuck and Co., Inc., 21 F.3d 989, 992 (10th Cir.1994) (quoting Spulak v. K Mart Corp., 894 F.2d 1150, 1153 (10th Cir.1990)). We may reverse the district court only if the evidence is "susceptible to no reasonable inferences sustaining the position of the party against whom the motion is made." Id. (quoting Spulak, 894 F.2d at 1153 (citation omitted)).
 
 
 16
 In order to support a jury verdict of constructive discharge, an employee must prove that the employer's actions made working conditions so difficult that a reasonable person in the employee's position would find them intolerable and would feel compelled to resign as a result. Id. A demotion or reassignment to a job with lower pay or lower status may--depending on the aggravating nature of the individual facts and circumstances of the case--be sufficient to support a jury verdict of constructive discharge. Id. at 993.
 
 
 17
 While we might not reach the same result that the jury did on the evidence before us, we believe the question was properly submitted to the jury and find no basis for reversing their factual finding of constructive discharge. It is undisputed that Touchet was being "demoted" or reassigned to another job with lower pay and lower status. Thus, the question before us is whether the facts and circumstances of this case present sufficient aggravating factors to support a jury verdict of constructive discharge.
 
 
 18
 Touchet provided evidence that his medical condition could have lead to serious risks if he had accepted the transfer to South Dakota. This evidence consisted of a letter from Touchet's doctor as well as Touchet's subsequent letter to the company and his trial testimony that he believed he would be taking serious medical risks by accepting the transfer. Touchet also provided evidence that he was encouraged to retire and discouraged from accepting the transfer to Williston. We believe that this combination of evidence is sufficient to support a jury verdict of constructive discharge.
 
 
 19
 Halliburton argues that, even if Touchet provided sufficient evidence to allow the jury to find constructive discharge, such a finding was against the great weight of the evidence, and the case should be remanded for a new trial. The district court's denial of a motion for a new trial is reviewed for abuse of discretion, and will be reversed "only when the verdict is clearly, decidedly or overwhelmingly against the weight of the evidence." Franklin v. Thompson, 981 F.2d 1168, 1171 (10th Cir.1992). Based on the evidence presented at trial, we cannot say that the trial court abused its discretion in denying Halliburton's motion for new trial on the issue of constructive discharge. Thus, we affirm the jury's factual finding of constructive discharge.
 
 
 20
 B. Age Discrimination in Violation of the ADEA
 
 
 21
 In reviewing the district court's decision to deny Halliburton's motion for judgment as a matter of law and to submit the issue of age discrimination to the jury, we review the question de novo, "view[ing] the evidence most favorably to the non-moving party and giv[ing] that party the benefit of all reasonable inferences to be drawn from the evidence." James, 21 F.3d at 992 (quoting Spulak, 894 F.2d at 1153). We may reverse the district court only if the evidence is "susceptible to no reasonable inferences sustaining the position of the party against whom the motion is made." Id. (quoting Spulak, 894 F.2d at 1153 (citation omitted)). Because the jury may have relied on the alleged ageist comments attributed to Joe McCalla, we first must determine whether this particular evidence was properly before the jury before deciding whether the totality of the evidence was sufficient for a jury finding of intentional age discrimination.
 
 1. Admission of Statements by Joe McCalla
 
 22
 Halliburton argues that the district court erred in admitting age-related comments attributed to Joe McCalla because those comments were both highly prejudicial and of no probative value. Evidentiary rulings are reviewed for abuse of discretion and will not be disturbed unless we have a definite and firm conviction that the district court made a clear error or exceeded the bounds of permissible choice under the circumstances. Gilbert v. Cosco Inc., 989 F.2d 399, 402 (10th Cir.1993).
 
 
 23
 General and isolated age-related comments are not admissible to prove intentional age discrimination. Cone v. Longmont Hosp. Ass'n, 14 F.3d 526, 531 (10th Cir.1994). Instead, a plaintiff must demonstrate that a nexus exists between the discriminatory comments to be admitted and the allegedly discriminatory actions to be proven. Id. Even comments by a supervisor involved in the allegedly discriminatory actions are not admissible unless connected to the discriminatory actions themselves. See id. at 531-32 (holding that statement of supervisor involved in allegedly discriminatory termination was not admissible as there was no connection between the statement and the termination).
 
 
 24
 Touchet was permitted to testify at trial--over Halliburton's objection--that Joe McCalla told him to terminate, or pressure into resigning, another employee who was over 40, because he was too old.[6] Appellant App. at 243-44. Touchet attempts to provide the necessary nexus between McCalla's comments and Touchet's demotion and transfer by pointing to evidence of: 1) animus between McCalla and Touchet; 2) other ageist comments by McCalla to Harkins; and 3) McCalla's prior supervision of Travis Burke ("Burke"), one of the supervisor's involved in the decision to demote and transfer Touchet. However, none of these allegations--even if all true--provide the necessary nexus between the comments and the actions complained of.
 
 
 25
 McCalla himself was dead at the time the decision was made to demote and transfer Touchet. Thus, the relevance of any comments by McCalla is limited to any effect McCalla may have had on the decision makers prior to his death. Any animus between McCalla and Touchet is irrelevant in any case if it does not relate to age. In addition, there is no evidence that McCalla passed on any ageist attitudes or practices to the employees who made the decisions affecting Touchet. In short, there is no evidence of any kind indicating that Joe McCalla had any effect on the decision to demote and transfer Touchet or on the individuals who made that decision. In the clear absence of such a connection, the district court abused its discretion in admitting the evidence.
 
 
 26
 Touchet argues however that, even if the testimony was admitted in error, the error was harmless because there was other testimony establishing the same premise--that Halliburton discriminated against older employees. In determining whether an error is harmless, we assess the likelihood that the error "affect[ed] the substantial rights of the parties." U.S. Indus., Inc. v. Touche Ross & Co., 854 F.2d 1223, 1252 (10th Cir.1988) (quoting 28 U.S.C. 2111). In a civil case, we must determine whether the verdict, more probably than not, was untainted by the error. Id. If so, then the error is harmless and retrial is unnecessary. Id.
 
 
 27
 In support of his argument that the testimony at issue did not substantially affect the judgment, Touchet points out other testimony by himself, Appellant App. at 245-46, 327-28, K.P. Campbell, Id. at 334, and Harkins, Id. at 427, 433, establishing that Halliburton supervisors told them to hire younger employees rather than older ones. While this other testimony relates only to discriminatory hiring--rather than termination--practices, we believe that the overall weight of evidence of age based discrimination by Halliburton was sufficient that, more probably than not, the jury verdict was not affected by Touchet's testimony as to McCalla's comments. We, therefore, hold that the district court's error in admitting the testimony was harmless. We must now determine whether Touchet's evidence--without the inadmissible testimony regarding McCalla's comments--was sufficient to justify submission to a jury.
 
 
 28
 2. Evidence of Intentional Age Discrimination
 
 
 29
 The essential inquiry in an ADEA claim for intentional discrimination is whether age was a "determinative factor," such that it "made a difference" in an employer's decision to terminate an employee.[7] Cooper v. Asplundh Tree Expert Co., 836 F.2d 1544, 1547 (10th Cir.1988). A plaintiff may prove such intentional discrimination through either direct or circumstantial evidence. Ingels v. Thiokol Corp., 42 F.3d 616, 620 (10th Cir.1994). To facilitate this inquiry, we have adopted the McDonnell Douglas burden shifting approach in ADEA cases. Ingels, 42 F.3d at 621. Under this approach, a plaintiff may establish a prima facie case by demonstrating that he or she: (1) was a member of the protected age group; (2) was performing satisfactory work; (3) despite satisfactory performance, was terminated; and (4) was replaced by a younger worker. Id. However, in reduction-in-force cases, the fourth element may be met through evidence that the plaintiff was treated less favorably than younger employees during the reduction-in-force. Id.
 
 
 30
 Touchet presented evidence that he was a member of the protected age group, that his work was satisfactory, and that he was nevertheless constructively terminated. He also provided evidence that Madden, a younger employee, was given the opportunity to serve as the Field Supervisor "camp head" at Worland, a position that was not offered to Touchet. Halliburton argues that it provided evidence to contradict each element other than Touchet's protected status; however, in doing so, Halliburton misunderstands the application of the McDonnell Douglas approach. Touchet's burden of establishing a prima facie case is not a heavy one, see MacDonald v. Eastern Wyo. Mental Health Ctr., 941 F.2d 1115, 1119 (10th Cir.1991), and he easily met that burden. Halliburton's arguments to the contrary provided an appropriate basis for its alleged nondiscriminatory reasons for its actions with respect to Touchet. Thus, while Halliburton's arguments were appropriate for the jury to consider in deciding whether Touchet met his overall burden of persuasion, they do not affect the fact that Touchet successfully established a prima facie case.
 
 
 31
 After a plaintiff has created a presumption of intentional discrimination by establishing a prima facie case, the defendant may rebut that presumption by providing a legitimate, nondiscriminatory reason for the employment decision in question. Ingels, 42 F.3d at 621. Halliburton met this burden by explaining that Touchet was demoted due to a reduction-in-force and transferred to Williston because that location could accommodate him economically. Halliburton further explained that Madden was given the Worland Field Supervisor position instead of Touchet because Halliburton believed Madden would be more likely to make Worland profitable again, Touchet's transfer would avoid ill effects of his demotion on morale, and the transfer would alleviate any stress that Touchet was experiencing as camp head.
 
 
 32
 Once the defendant has rebutted the presumption created by plaintiff's prima facie case, the plaintiff has the overall burden of persuading the finder of fact that the employer intentionally discriminated based on age. Ingels, 42 F.3d at 622. In carrying this burden, Touchet's evidence of age discrimination includes evidence: 1) of statements by Halliburton supervisory personnel that the company should hire younger rather than older workers; 2) that Halliburton denied Touchet a lateral transfer to field supervisor at Worland, essentially his old position as "camp head" and, instead, filled the position with Madden, a younger worker; 3) that Halliburton's decision to transfer Touchet to Williston and Madden to Worland was economically inefficient because it required two transfers instead of one; 4) that Williston was a "dumping ground" for undesirable or older workers; 5) that Touchet had health problems, of which Halliburton knew, which would be aggravated at Williston by longer hours, greater driving distances, and more physically demanding work; and 6) that Halliburton's employees tried to convince Touchet to take early retirement and leave the company, Appellee's App. at 108-21. We believe that this combination of evidence is sufficient for a reasonable jury to conclude that Halliburton intentionally discriminated against Touchet on the basis of his age in violation of the ADEA. Thus, we must next consider the jury instructions provided by the court in relation to Touchet's ADEA claim.
 
 3. Jury Instructions
 
 33
 Halliburton argues that the district court erred by improperly instructing the jury as to the relative burdens of proof in an ADEA case in instruction No. 9, and further erred by refusing to give three proposed instructions tendered by Halliburton. In reviewing these allegations, we examine "the record as a whole to determine whether the instructions state the applicable law and provide the jury with an appropriate understanding of the issues and the legal standards to apply." Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1424 (10th Cir.1993). As long as the instruction as a whole correctly conveys applicable law, particular words or phrases are unnecessary. Id. Thus, "[a]n erroneous jury instruction requires reversal only if we have substantial doubt whether the instructions, taken together, properly guided the jury in its deliberations.' " Id. (quoting Mitchell v. Mobil Oil Corp., 896 F.2d 463, 468 (10th Cir.), cert. denied, 498 U.S. 898 (1990)).
 
 
 34
 Jury Instruction No. 9 instructed the jury as follows:
 
 
 35
 As I mentioned before, if you find that the plaintiff proved the four elements by a preponderance of the evidence, then you may, but need not, find for the plaintiff. In deciding which party is entitled to a judgment, you must consider whether the defendant has produced evidence that the plaintiff was transferred for a reason other than age, that is, that the defendant had a legitimate, non-discriminatory reason other than age for the plaintiff's transfer.
 
 
 36
 The defendant is only required to produce evidence of a non-discriminatory reason; it is not required to prove this reason or reasons by a preponderance of the evidence. It is only required to come forward with, or to produce, evidence that explains that its actions were not based on the plaintiff's age. In addition, it is not necessary that the defendant's nondiscriminatory reason or reasons for discharging the plaintiff be correct, but only that it believed them in good faith.
 
 
 37
 If you find that the defendant has produced such evidence, then you must find for the defendant unless you conclude that the plaintiff has proved, by a preponderance of the evidence, that the reasons offered by the defendant for his discharge were a pretext, that is, they were not the true reasons why he was discharged, or that the plaintiff's age more likely than not was still a determining factor in his discharge.
 
 
 38
 The plaintiff is the party that bears the ultimate burden of proving to you, the jury, by a preponderance of the evidence that the defendant's decision was an intentional one that was predicated on the plaintiff's age.
 
 
 39
 Appellant's App. at 74-75. Halliburton argues that the instruction erroneously states that the jury may find for the plaintiff simply based on Touchet's establishment of a prima facie case--irrespective of Halliburton's proffered nondiscriminatory reason for its action--and also argues that the instruction erroneously states that Touchet can meet his burden of overcoming Halliburton's proffered nondiscriminatory reason through evidence only of the pretextual nature of that reason. While we agree that the instruction might be somewhat clearer, we have no substantial doubts that, taken as a whole, instruction no. 9 properly guided the jury.
 
 
 40
 The instruction states in the first paragraph that the jury may find for Touchet based solely on the elements of a prima facie case. However, in the second paragraph, the instruction goes on to explain Halliburton's burden of producing evidence of a nondiscriminatory reason for its actions. Then, in the third paragraph, the jury is instructed that, if Halliburton produces such evidence of a nondiscriminatory reason for its actions, the jury may only find for Touchet if he proves pretext. In the last paragraph, the instructions explain that Touchet must prove, by a preponderance of the evidence, that Halliburton intentionally discriminated against him based on his age. We believe that the overall instruction sufficiently conveyed to the jury that they could only find for Touchet if they believed that Halliburton's proffered nondiscriminatory reasons for its actions were merely a pretext for intentional discrimination based on age.
 
 
 41
 Halliburton next argues that the district court erred in refusing to give its proffered instructions that: 1) the ADEA doesn't require employees to give persons more than 40 years old preferential treatment, but requires only age neutrality; 2) the jury is not free to second guess a employer's age neutral business decisions; and 3) Halliburton's perceptions of Touchet's qualifications are controlling--not Touchet's own perceptions. While we do not quarrel with the legal correctness of these instructions, we do not believe that their omission gives us any basis for substantially doubting the adequacy of the overall ADEA instructions in guiding the jury. Thus, we affirm the decisions of the district court with respect to the challenged jury instructions.
 
 4. Frontpay Award
 
 42
 The decision to order reinstatement or to award frontpay under the ADEA is committed to the discretion of the trial court. James, 21 F.3d at 997. Thus, we review the district court's decision to award frontpay in this case under an abuse of discretion standard.
 
 
 43
 While reinstatement is the preferred remedy under the ADEA, frontpay may be appropriate in circumstances where employer hostility makes a productive and amicable working relationship impossible. Id. The question of whether Halliburton had exhibited such hostility was submitted to the jury on an advisory basis, and the jury answered "yes," Halliburton had. The district court agreed with the advisory jury finding and ordered frontpay. We believe the jury's advisory finding and the court's subsequent decision were supported by adequate evidence of hostility exhibited by Halliburton employees towards Touchet during trial.
 
 
 44
 Therefore, we affirm the decision of the district court to award frontpay in lieu of reinstatement. In summary, we affirm the district court's entry of judgment based upon the jury's verdict of intentional age discrimination in violation of the ADEA.
 
 
 45
 C. Refusal to Admit Employment At-Will Disclaimer
 
 
 46
 Halliburton argues that the district court erred in refusing to admit a disclaimer signed by Touchet providing for employment at-will. Again, evidentiary rulings are reviewed for abuse of discretion, and will not be disturbed unless we have a definite and firm conviction that the district court made a clear error or exceeded the bounds of permissible choice under the circumstances. Gilbert, 989 F.2d at 402.
 
 
 47
 Halliburton sought to admit the disclaimer as evidence that Touchet's employment with Halliburton was at will, and there was no employment contract between the parties. Thus, without a contract for employment, Halliburton could not have breached any obligation to Touchet. The district court ruled that, because the disclaimer was not conspicuous, it was not relevant to the issue of whether a contract existed. The district court also stated that, "in light of the overwhelming and uncontroverted evidence that the defendant's policies were contrary to that document, the evidence could be excluded under Rule 403." Order Denying Defendant's Post Trial Motions at 44. We agree with the district court that the disclaimer evidence was irrelevant and, even if relevant, was more prejudicial than probative and properly excluded under Fed.R.Evid. 403.
 
 
 48
 The Wyoming Supreme Court has stated that "for a disclaimer to be effective if must be conspicuous." McDonald v. Mobil Coal Producing, Inc., 820 P.2d 986, 988 (Wyo.1991) ("McDonald II "). Whether a disclaimer is conspicuous is a matter of law for the court to decide. Id. The disclaimer statement at issue was contained in an agreement between Touchet and Halliburton signed in 1963. Under the agreement, Touchet granted to Halliburton the rights to certain intellectual property he might develop in connection with his job, "[i]n consideration of the agreement of the company to employ or continue to employ the undersigned, it being understood that such employment may be terminated at the will of the Company." Appellant's App. at 524 (emphasis added). The district court held that this disclaimer was not conspicuous, and we agree.
 
 
 49
 Halliburton argues that, even if the disclaimer was not conspicuous, it should have been admitted to assist the jury in its overall determination of whether there was an employment contract between Touchet and Halliburton. In support of this argument, Halliburton relies on subsequent language from McDonald II stating that even inconspicuous disclaimers figure in determination of the factual question of whether an employment contract existed.
 
 
 50
 In McDonald II, the court first reviewed the employer's attempted disclaimers in the employment application and the employee handbook, and held that they "were insufficiently conspicuous to be binding on [the employee]." 820 P.2d at 989. However, the court then addressed the question of whether, under the objective theory of contracts, the employer made sufficient objective manifestations of intent to contract. Id. at 990. The disclaimers at issue were relevant to the question of whether the employee was objectively reasonable in assuming the employer was inviting his assent to contract. Id. In McDonald II, the employee's allegations of the existence of a contract were based upon representations in the employee handbook itself, McDonald v. Mobil Coal Producing, Inc., 789 P.2d 866, 868 (Wyo.1990) (stating facts of case) ("McDonald I "), modified, McDonald II, 820 P.2d 986, and the legally inconspicuous disclaimers were in the handbook and within an employment application signed when the employee was hired and just one year before his termination. McDonald I, 789 P.2d at 867-68. Thus, disclaimers made in connection with the recent hiring of the employee and the handbook that formed the basis of the employee's claim were relevant to the objective reasonableness of the employee's belief that the employer intended to contract--irrespective of whether they were conspicuous.
 
 
 51
 However, the disclaimer in the case before us is distinguishable from that in McDonald I & II. Touchet signed the agreement containing the disclaimer in question at the time he was hired.[8] However, the disclaimer related specifically to consideration in exchange for his agreement to turn over certain intellectual property to Halliburton--as opposed to inclusion in a general application for employment--and the disclaimer was signed 29 years before Touchet's termination. Touchet's claim as to the existence of an employment contract is based upon subsequent events, as well as Halliburton's Employee Handbook dated July, 1987. Standing alone, this inconspicuous disclaimer from and agreement regarding intellectual property, signed in 1963, has little if any relevance to the issue of whether there was a contract between Touchet and Halliburton in 1992. Thus, we cannot say that the district court abused its discretion in excluding the disclaimer because it was irrelevant or, at least, more prejudicial than probative.
 
 III. CONCLUSION
 
 52
 For the reasons stated above, we AFFIRM the decision of the district court.
 
 COOK, Senior District Judge, dissenting:
 
 53
 I Respectfully dissent. From my review of the record, I do not believe that plaintiff adduced sufficient evidence to warrant a jury's determination that defendant took an "adverse employment action" against plaintiff on the basis of age. In particular, plaintiff's evidence does not meet the test used in this circuit to demonstrate that he was constructively discharged by defendant.
 
 
 54
 The test for finding constructive discharge is "whether the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." James v. Sears, Roebuck and Co., Inc., 21 F.3d 989, 992 (10th Cir.1993). The James decision additionally noted that "[a] finding of constructive discharge must not be based upon the discriminatory act" but "there must also be aggravating factors that make staying on the job intolerable." Id. I do not agree that the facts and circumstances of this case present sufficient aggravating factors to support a jury verdict of constructive discharge.
 
 
 55
 First, I find no evidence in the record that a reasonable person would consider the working conditions in Williston to be "intolerable." Rather, the record evidences plaintiff's fears and assumptions that Williston, and the Field Supervisor position there would be intolerable, given his health problems. The subjective views of the employee-claimant may not be considered in assessing the intolerableness of the new job situation. In Irving v. Dubuque Packing Co., 689 F.2d 170 (10th Cir.1982), this court concluded that "[a] finding of constructive discharge depends upon whether a reasonable person would view the working conditions as intolerable, not upon the subjective view of the employee." Id. at 172. In the instant case, however, the aggravating factors identified as supporting the jury verdict of constructive discharge are derived from plaintiff's subjective view that a transfer to Williston would be intolerable and that defendant was trying to get rid of him. Under Irving, the subjective evidence of plaintiff's fears, health concerns and perceptions of the Williston position should not have been considered in assessing whether a reasonable person would find the Williston working conditions intolerable. That same evidence cannot be considered to constitute "aggravating factors" to support the jury's verdict of constructive discharge. Without these "aggravating factors," plaintiff has not met the test for constructive discharge, and thus no "adverse employment action" under the ADEA occurred.
 
 
 56
 Second, I find no evidence that defendant "made" the working conditions in Williston that plaintiff found so intolerable that he opted instead for a medical retirement. Defendant did not create new, harsher working conditions in transferring plaintiff to Williston, but rather sought to transfer him to an established job title at an established work camp, as part of an economically-determined company-wide downsizing. The work conditions that existed were standard, usual, normal and necessary for the business of the defendant. I find no evidence that defendant had any knowledge, at the time it made the decision to transfer plaintiff to Williston, that the transfer would pose any serious risks to plaintiff's health; to the contrary, plaintiff's supervisors testified that part of their decision to transfer plaintiff to Williston was that they felt Williston would be less stressful for plaintiff's heart problems.
 
 
 57
 The critical problem which will hamper future determinations of constructive discharge in this circuit is the majority opinion's abandonment of the "reasonable person" test. In my view, the "reasonable person" test's phrase, "in the employee's position," references the working conditions of the job to which the plaintiff is assigned. The majority, however, reads that phrase, "in the employee's position" to mean the personal characteristics or circumstances peculiar to the plaintiff which may cause the working conditions to then be intolerable to a particular plaintiff.[1] In the instant case, the focus of the test for constructive discharge should be the working conditions in Williston and whether a reasonable person would find those conditions to be intolerable. Instead, the majority focuses on characteristics peculiar to plaintiff (his heart problem), and then permits the working conditions to be judged to be intolerable according to plaintiff's particular characteristic. If we consider physical characteristics, such as a disability, in assessing intolerableness of working conditions, we render the Americans with Disabilities Act (ADA) unnecessary, since anyone coming within the purview of a law prohibiting discrimination could avoid the requirements for relief under the ADA. This case is such an example, where only because of plaintiff's disabling heart condition and his belief that his disability made the working conditions in Williston difficult, plaintiff refused to take the transfer, took medical retirement based on his disability and then sued defendant for age discrimination, rather than attempting a case of disability discrimination.
 
 
 58
 The majority opinion reinforces my concern about cases where an employee envisions problems with a position he or she has not taken, quits, and then claims constructive discharge. Constructive discharge should not become an "out" for an employee faced with an unhappy job choice, nor should such an employee perceive constructive discharge as a means to "second-guess the business judgment" of an employer whose restructuring affects that employee adversely, but not discriminatorily. Here, if plaintiff had tried the job and found his physical disability really made it intolerable, under any test, he could have so advised defendant and we would certainly have a more objective factual evidentiary record to evaluate constructive discharge. This would also have given defendant an opportunity to determine whether a reasonable accommodation could be made so that plaintiff could perform his job.
 
 
 59
 If the circuit wishes to change the "reasonable person" test for constructive discharge, I do not believe that this is the proper case to make that change. If the focus of the test is to change from the working conditions to the employee's unique characteristics in assessing intolerableness, then the circuit needs to set forth a stronger statement than is provided in the majority opinion. In instructing juries on issues of constructive discharge in the future, for example, should a district court instruct only as to an employee's physical disabilities, or can other disabilities, of a mental, social or financial nature, be considered by the jury in assessing whether the job is intolerable to the plaintiff-employee. Certainly, if the test is to focus on individual employee characteristics, the district courts should be provided with some guidance on what characteristics may be properly considered.
 
 
 60
 For these reasons, I respectfully dissent.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3
 
 
 [2]
 The Honorable H. Dale Cook, Senior District Court Judge for the Northern District of Oklahoma, sitting by designation
 
 
 [3]
 Because this case is before us as an appeal of a jury verdict in favor of Touchet, we must construe the evidence and any inferences therefrom in favor of Touchet. See James v. Sears, Roebuck and Co., Inc., 21 F.3d 989, 992 (10th Cir.1994). The following statement of facts is based on such deference to the evidence presented by Touchet at trial
 
 
 [4]
 Under Halliburton's management structure, without an assistant district manager in Worland, a Field Supervisor assumed the responsibilities as "camp head."
 
 
 [5]
 There was apparently little, if any, difference between Assistant District Manager as "camp head" and Field Supervisor as "camp head" at the Worland camp
 
 
 [6]
 Touchet's testimony was not hearsay because it was an admission by an agent of a party, admissible under Fed.R.Evid. 801(d)(2)(D)
 
 
 [7]
 In this case, involving "constructive discharge," Halliburton's decision to demote and transfer Touchet is treated as the termination decision
 
 
 [8]
 The disclaimer is dated March 7, 1963, and Touchet began working for Halliburton on March 8, 1963, Appellant's App. at 2
 
 
 [1]
 Plaintiff's heart problems are personal circumstance which factored into his decision to either move to Williston or take medical retirement. Plaintiff and other employees of defendant testified that employees were regularly transferred among defendant's work camp sites; thus, a transfer to Williston or elsewhere was not out of the realm of possibility for plaintiff while he remained in defendant's employ. Plaintiff's stated reason for not wanting to go to Williston was that his health problems would keep him from performing his job there. A plaintiff's circumstances do not constitute grounds for a claim that his employer constructively discharged him. Cherchi v. Mobil Oil Corp., 693 F.Supp. 156, 163 (D.N.J.1988), affm'd 865 F.2d 249 (3d Cir.1988). See also Smith v. Goodyear Tire & Rubber Co., 895 F.2d 467, 473 (8th Cir.1990) (employee's refusal of transfer because of fear of inability to sell his house in economically depressed area does not state claim for constructive discharge); Weihaupt v. AMA, 46 F.E.P.Cas. 377, 380 (N.D.Ill.1988) (to the extent that plaintiff's cancer influenced his decision to opt for early retirement, a claim of constructive discharge is not tenable)